**James F. HAIGHT, et al., Petitioners,**

v.

**DISTRICT OF COLUMBIA ALCOHOLIC BEVERAGE CONTROL BOARD, Respondent.**

No. 80–271.

District of Columbia Court of Appeals.

Argued Jan. 6, 1981.

Decided Dec. 21, 1981.

Courts Oulahan, Washington, D.C., for petitioners.

Philip T. Van Zile, III, Asst. Corp. Counsel, Washington, D.C., with whom Judith W. Rogers, Corp. Counsel, and David P. Sutton, Acting Deputy Corp. Counsel, Washington, D.C., were on the brief, for respondent.

Before NEWMAN, Chief Judge, and HARRIS and FERREN, Associate Judges.

NEWMAN, Chief Judge:

Petitioners, James Haight, Sam Kramm, and Earl Meyerson, all Georgetown business owners, seek review of a decision of the District of Columbia Alcoholic Beverage Control Board granting the application of Matilda, Inc., t/a Cafe Matilda (Matilda's) for a Class "D" liquor license to serve beer and wine. See D.C.Code 1973, § 25–111(h). Petitioners contend that the Board erred in excluding certain evidence from the hearing, improperly shifted the burden of proof to the petitioners, and unlawfully issued Class "F" licenses to Matilda's, see id. § 25–111(j), thereby prejudging the Class "D" proceedings.[1] We affirm the Board's order.

I. *Facts and Proceedings*

In early August 1979, Matilda's filed an application for a class "D" liquor license for

---

1. In addition, petitioners claim that the Board was biased in favor of the applicant at the hearing, and that the Board members "unrea- sonably harassed and attacked" petitioners' witnesses. We find no merit to these claims.

the premises at 3263 M Street, N.W. The Board conducted a hearing on September 12, 1979.

In support of the application, Mohammed Ben Aniba, secretary-treasurer and a director of Matilda's, testified that neither he nor any other officer had been convicted of any felony or of a misdemeanor under the National Prohibition Act. He further testified that he was a bona fide resident of the United States, that he had had a stable business career, and that Matilda's two other officers (Ben Aniba's wife and sister-in-law) were legal residents of the United States. Ben Aniba also testified that he had been associated with the premises for approximately twenty years, although Cafe Matilda itself had opened on or about June 14, 1979. He added that there had been no trouble with the police, that trash was collected regularly, and that parking was available on the street and in nearby lots. Irving Hall, an employee at a nearby parking lot and a patron of Matilda's, confirmed the cleanliness of the establishment and the availability of parking. Finally, Matilda's introduced a petition containing 190 signatures in support of the application.

Petitioners attempted to cross-examine Ben Aniba about his ownership of a duly licensed retail shop, the Birdcage,[2] located upstairs from Matilda's, which had sold a variety of items, including imported clothing and jewelry, and "drug paraphernalia."[3] Apparently, Ben Aniba had owned and operated this shop on the first floor of the premises for approximately five years, but had moved it upstairs when Matilda's opened. He testified, however, that one week prior to the liquor license hearing, he had sold that business. As of the date of the hearing, the inventory had been removed from the premises.

Petitioners sought to argue to the Board that Ben Aniba's previous ownership of the Birdcage was relevant both to the appropriateness of the premises for a liquor license, see id. § 25–115(a)(6), and to the moral character or general fitness of Ben Aniba himself, see id. § 25–115(a)(1). The Board ruled, however, that any evidence or testimony relating to the upstairs shop was irrelevant, for two reasons: first, the upstairs shop was not part of the premises to be licensed, and second, the upstairs shop was no longer in existence, and therefore not relevant to the appropriateness of the applicant's premises. Only if the protestants could show illegal activity, the Board ruled, would the evidence be admitted. The Board accordingly prevented petitioners from pursuing this line of questioning and ruled that any testimony already given on this subject would be stricken from the record.

Petitioners were permitted to proffer the testimony of two opposition witnesses on this issue. The first witness was Carl Jenkins, employed by petitioner James Haight at "Mr. Smith's" restaurant, a licensed establishment located approximately two blocks from Matilda's, who would have testified as to the items that he had seen for sale in the upstairs shop. The Board rejected this proffer, however, as petitioners' counsel conceded that the witness had neither observed nor purchased anything illegal. Petitioners' second witness, Jonathan Edges, was proffered as an expert in the field of drug abuse. Petitioners' counsel stated that he would testify, first, that items such as water pipes are used primarily in connection with illegal drugs, and second, "that the sale of drug paraphernalia, even though in itself it is not per se illegal, it contributes to drug abuse and crime and is a detriment to the communi-

2. The name of the shop was disputed. Ben Aniba testified that it was the "Birdcage Gift Shop." A witness for the petitioners testified that it was the "Birdcage Head Shop." We simply refer to the shop as the Birdcage.

3. The only specific items mentioned in the record that can properly be characterized as "drug paraphernalia" are "bong" pipes, or water pipes, and cigarette rolling papers. In the context of this case, we do not intend the term "drug paraphernalia" to encompass such items as hypodermic needles, syringes, or cookers, used in preparing or injecting heroin. See McKoy v. United States, D.C.App., 263 A.2d 645, 649 (1970); McKoy v. United States, D.C. App., 263 A.2d 649, 651 (1970).

ty." Again, the Board rejected the proffered testimony in light of its earlier ruling.

The Board did hear testimony from two other witnesses in opposition to the application. The first was petitioner James Haight, president and general manager of "Mr. Smith's" restaurant. The second witness was Caren Pauley, an Advisory Neighborhood Commissioner who lived one or two blocks from Matilda's, and who was appearing in an unofficial capacity.[4] Both witnesses testified that the Georgetown area (where Matilda's is located) is saturated with liquor establishments and that the proliferation of liquor licenses was ruining the community. Specifically, Pauley testified that the area was plagued by traffic, crime, litter, and noise attracted by liquor establishments. Other than Matilda's affiliation with the Birdcage shop, however, neither witness said there was anything particularly wrong with the applicant. They emphasized, rather, that this would be one more liquor establishment in an area where there were already too many. Pauley added that she and others had attempted, so far without success, to have the District Council declare a moratorium on liquor licenses in the area.

After the hearing, the Board granted Matilda's applications for two consecutive Class "F" (temporary) licenses running through October 15, 1979. On October 9, petitioners moved to suspend or revoke the temporary license then in effect. In response, Matilda's requested permission of the Board to withdraw its pending application for another Class "F" license. On November 26, 1979, the Board granted Matilda's request to withdraw the application and—because the previous licenses had expired—denied petitioners' motion for suspension as moot.[5] Matilda's sought no further Class "F" licenses.[6]

On March 3, 1980, the Board issued its Findings of Fact and Conclusions of Law. It found that the officers of Matilda's were legally resident aliens, *but see id.* § 25–115(a)(3),[7] and had never been convicted of a felony or of a misdemeanor under the National Prohibition Act. *Id.* § 25–115(a)(2). The Board further found "there is no evidence of record indicating" that any of Matilda's officers and directors are "other than of good moral character." *Id.* § 25–115(a)(1). In addition, the Board found that Matilda's met various legal requirements as to ownership, *id.* §§ 25–115(a)(4) & (5), and as to distance from objecting neighbors (600 feet), *id.* § 25–115(c), and from schools and churches (400 feet). 3 DCRR § 2.2. Finally, the Board

---

**4.** No official action can be taken by the Commission without a majority of its elected members present and voting. D.C.Code 1978 Supp., § 1–171i(d). In the instant case, no official ANC position was advanced because the meeting at which this application was discussed had failed to attain a quorum.

**5.** Petitioners had also moved that one of the Board members recuse himself and that the Class "D" hearing be reopened for new evidence. The Board's simultaneous denial of these motions is not challenged here by the petitioners.

**6.** Petitioners did not appeal this decision immediately, but instead, waited until they sought review of the Board's decision on the Class "D" license.

**7.** D.C.Code 1973, § 25–115(a)(3), requires that each principal officer of a corporation seeking a liquor license be a citizen of the United States. The Board found that Matilda's officers are legally resident aliens. Petitioners did not contest that finding under § 25–115(a)(3),

because it shared the Board's view that this citizenship requirement, in this context, is an unconstitutional denial of the equal protection of the laws. We agree. *See Examining Bd. v. Flores de Otero,* 426 U.S. 572, 601–06, 96 S.Ct. 2264, 2280–83, 49 L.Ed.2d 65 (1976) (citizenship requirement for engineering license); *In re Griffiths,* 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973), (exclusion of non-citizens from practice of law); *Takahashi v. Fish & Game Comm'n,* 334 U.S. 410, 419, 68 S.Ct. 1138, 1142, 92 L.Ed. 1478 (1948) (denial of fishing licenses to non-citizens). We note also that the statute appears to violate 42 U.S.C. § 1981 (1976), which provides in part, "All persons ... shall have the same right ... to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white *citizens* and shall be subject to like punishment, pains, penalties, taxes, *licenses* and exactions ...." (emphasis added). *See* Comment, *Developments in the Law—Section 1981,* 15 Harv.Civ.Rts.—Civ.Lib. L.Rev. 29, 150–51 (1980).

made findings with respect to the character of the premises, its surroundings, and the wishes of others in the neighborhood, *see* D.C.Code 1973, § 25–115(a)(6), including findings that trash was removed five days a week, that there was public parking in the immediate area, that petitions had been filed with 190 signatures in support of the application, and that a total of four persons had written and/or appeared in opposition. The Board summarized its findings as to appropriateness of the premises:

> 30. Protestants' contention that no further licenses be issued in this area is more appropriately addressed to the District of Columbia City Council. (See Section 25–107, D.C.Code, 1973 Edition of the Act.)

> 31. With respect to Protestants' contention that the premises [are] inappropriate because of the operation of a gift shop on the second floor, the Board notes that applicant's occupancy of the premises is restricted to the first floor and basement (for storage). (See Certificate of Occupancy No. B116223).

> \* \* \* \* \* \*

> [36.] The place for which the license is sought is appropriate considering the character of the premises, its surroundings and, the wishes of the persons residing or owning property in the neighborhood.

The Board accordingly concluded that Matilda's met all statutory requirements and granted its application for a Class "D" liquor license through June, 1980.

## II. *Exclusion of Evidence Regarding the Upstairs Shop*

Petitioners attempted to introduce testimony about the Birdcage Shop with respect to two issues: appropriateness of the premises for a license, *see* D.C.Code 1973, § 25–115(a)(6), and fitness and good character of the applicant, *see id.* § 25–115(a)(1). The Board excluded this evidence as irrelevant to both issues. We hold that the Board did not abuse its discretion in so ruling.

We emphasize at the outset that, while administrative proceedings are governed by more liberal and flexible evidentiary standards than judicial proceedings, the agencies are invested with a correspondingly greater discretion than trial judges in determining the admissibility of evidence. *See Kopff v. District of Columbia Alcoholic Beverage Control Board,* D.C.App., 381 A.2d 1372, 1385 (1977). Because there is no jury to shield, agencies may tend to resolve any doubts in favor of admitting the evidence. Nevertheless, the DCAPA mandates the exclusion of "irrelevant, immaterial, and unduly repetitious evidence." D.C.Code 1978 Supp., § 1–1509(b). The Alcoholic Beverage Control Board itself has incorporated more specific evidentiary guidelines into its own regulations. The evidence at Board hearings is limited to

> material evidence relative to the issues arising in the proceeding as may be necessary to protect the public interest or to prevent injustice. Evidence will be excluded in the discretion of the Board if it is repetitious or redundant. *The Board shall determine the materiality, relevance and probative value of any evidence submitted.* [3 DCRR § 20.5 (emphasis added).]

In addition to the discretion conferred upon the agency in evidentiary rulings, we have also acknowledged that "an agency's interpretation of the statutes and regulations it administers will be sustained unless shown to be unreasonable or in contravention of the language or legislative history of the statute." *DeLevay v. District of Columbia Rental Accommodations Commission,* D.C.App., 411 A.2d 354, 359 (1980); *see Dupont Circle Citizens Association v. District of Columbia Zoning Commission,* D.C. App., 431 A.2d 560, 565 (1981). Thus we must accord considerable respect not only to the Board's evidentiary rulings themselves, but also to the Board's interpretation of the regulations that govern its evidentiary standards, as well as the Board's interpretation of the underlying statutory requirements for obtaining a liquor license, D.C. Code 1973, § 25–115, which the agency has been charged with administering. Where, as here, the Board has relied in part upon

its own internal procedural regulations, we are particularly hesitant to second-guess its interpretation, as long as the agency is within the bounds of reason. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Fund, Inc.,* 435 U.S. 519, 524–25, 543–45, 98 S.Ct. 1197, 1202, 1211–12, 55 L.Ed.2d 460 (1978); *Dupont Circle Citizens Association v. District of Columbia Zoning Commission, supra* at 565. The focus of our inquiry accordingly centers on whether the agency abused its discretion in excluding the proffered evidence as irrelevant.

### A. *Appropriateness of the Premises*

Before granting a license, the Board must find "[t]hat the place for which the license is to be issued is an appropriate one considering the character of the premises, its surroundings, and the wishes of the persons residing or owning property in the neighborhood of the premises in which the license is desired." D.C.Code 1973, §§ 25–115(a)(6). Petitioners contest the Board's ruling that the evidence relating to the Birdcage Shop was irrelevant to this statutory requirement.

■ Though the Board is required to consider the "*character* of the *premises* [and] its *surroundings*," *id.* (emphasis added), the Board ruled that the "premises" did not include the second floor of the building (where the Birdcage Shop had been located),[8] and the Board construed the term "surroundings" to include only existing surroundings, and not past or former surroundings.[9] In light of the Board's considerable discretion in ruling on evidentiary questions, *see Kopff v. District of Columbia Alcoholic Beverage Control Board, supra* at 1385, and in interpreting its own statutes and regulations, *DeLevay v. District of Columbia Rental Accommodations Commis-*

sion, *supra* at 359, we can find nothing at all unreasonable about the Board's ruling on this issue. *See also Jameson's Liquors, Inc. v. District of Columbia Alcoholic Beverage Control Board,* D.C.App., 384 A.2d 412, 418–20 (1978) (proximity of gas station to liquor store was insufficient in itself to support a finding that "drink and drive" atmosphere would be created).

### B. *Good Moral Character and General Fitness*

Petitioners next contend that the Board erred in excluding the Birdcage Shop evidence with respect to the statutory requirement that each corporate officer of the applicant be "of good moral character and generally fit for the trust to be in him reposed." D.C.Code 1973, § 25–115(a)(1).

The Board ruled that the only evidence it would consider relevant to the applicant's "moral character" or fitness would be evidence of illegal activity. Board member Williams explained:

> When I stated the position of the Board, I stated two bases on which it was irrelevant. And even if we could strain to find some relevance in it, that the only basis would be identification of some illegal activity.
>
> Now, unless you are prepared to give us some evidence of illegal activity, we understand what a bong is, and we don't need him on the stand to tell us what a bong is. If there was some evidence of the sale of illegal apparatus, goods, merchandise, or services of any kind, then we'd be glad to hear that because that is highly relevant. But to keep banging and banging away at water pipes, we're just not prepared to spend all of the rest of the afternoon dealing with water pipes.

---

8. "With respect to Protestants' contention that the premises [are] inappropriate because of the operation of a gift shop on the second floor, the Board notes that applicant's occupancy of the premises is restricted to the first floor and basement (for storage)." Finding 31.

9. For example, Board member Williams stated during the hearing, "You are confusing the record by going to something else in the past. You talk about what used to happen [in] the past, but we're not here to deal with history, we're here to deal with what this Applicant is applying for and what that restaurant will be used for."

Similarly, Board member O'Donnell stated: "[U]nless there's a violation of the law . . . it has no bearing and should not be permitted in this record."

█ We hold that the Board's interpretation of § 25–115(a)(1), and its concomitant exclusion of the disputed evidence as irrelevant, was reasonable and consistent with the terms of the statute. *See DeLevay v. District of Columbia Rental Accommodations Commission, supra* at 359; *Kopff v. District of Columbia Alcoholic Beverage Control Board, supra* at 1385.

Arguably, an interpretation to the contrary on these facts would raise serious constitutional questions.[10] The petitioners concede that the business activity in question here—the sale of water pipes and cigarette rolling papers—is lawful. *See William v. United States,* D.C.App., 304 A.2d 287, 289 (1973). What applicant would reasonably suspect that adherence to the requirements of the law could constitute bad "moral character"?[11] Moreover, were the Board to withhold this license urged by petitioners, its action would be inherently arbitrary and capricious, as well, for it would be "based on unarticulated and unannounced standards," *Miller v. District of Columbia Board of Appeals and Review,* D.C.App., 294 A.2d 365, 369 (1972), [*quoted in Woods v. District of Columbia Nurses' Examining Board, supra,* at 373]; *see Lewis*

*v. District of Columbia Commission on Licensure to Practice the Healing Art, supra* at 1152–53.

The Board avoided this quagmire by construing the statutory requirement of good moral character and general fitness in the circumstances of this case simply to proscribe illegal conduct and no more.[12] Consistent with this interpretation, the Board did not abuse its discretion by excluding the proffered evidence.

### III. Burden of Proof

Petitioners next contend that the Board, in effect, improperly shifted the burden of proof at the hearing from the applicants to the petitioners. Because this is a contested case, the burden of proving that the license requirements have been met lies with the applicant. D.C.Code 1978 Supp., § 1–1509(b). The Board must "satisfy itself" that every statutory requirement has been met before it may grant a license. D.C. Code 1973, § 25–115(a). Petitioners point to two instances in which the language of the Board's findings suggests that the Board may have misallocated the burden of proof.

### A. Good Moral Character and General Fitness

First, in Findings 5, 8, and 11, relating to moral character and fitness, *see* D.C.Code

10. Where the sovereign licenses a business, which the proprietor thereafter operates in a lawful manner and the fact of such operation is later used by the same sovereign as "evidence" that the proprietor is not "of good moral character and generally fit for the trust to be in him reposed," D.C.Code 1973, § 25–115(a)(1), the applicant might be deprived of fair notice as to what conduct is proscribed by the statute for purposes of eligibility for a liquor license. The statutory interpretation urged by petitioners might render § 25–115(a)(1) impermissibly vague on the ground that persons of common intelligence would necessarily have to guess at the meaning of the statute. *See Papachristou v. City of Jacksonville,* 405 U.S. 156, 162–63, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972); *Woods v. District of Columbia Nurses' Examining Board,* D.C.App., 436 A.2d 369, at 374; *Lewis v. District of Columbia Commission on Licensure to Practice the Healing Art,* D.C.App., 385 A.2d 1148, 1153 (1978).

11. We do not necessarily suggest that the Board could never require more of its license applicants than mere compliance with the law. But in order to do so the Board must put applicants on fair notice by making public its criteria. *Compare California v. LaRue,* 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972) (regulations restricting nude dancing in licensed establishments) *with 4934, Inc. v. Washington,* D.C.App., 375 A.2d 20, 24 (1977) (license could not be suspended for topless dancing absent "patently offensive" conduct or duly published regulations).

12. This interpretation of § 25–115(a)(1) does not render section (a)(1) redundant of § 25–115(a)(2), because section (a)(2) does not proscribe all illegal conduct; it covers only misdemeanor convictions under the National Prohibition Act within the previous five years, and any felony convictions within the previous ten years.

1973, § 25–115(a)(1), the Board stated, "There is *no* evidence of record indicating that [X] is *other than* of good moral character" (emphasis added). This language could be construed to imply, as petitioners urge, that the Board presumed the applicants were morally fit unless petitioners could prove otherwise, which they failed to do. On the other hand, the findings can also be construed to mean that there *was* evidence regarding fitness and moral character, but that all that evidence was favorable to the applicants. We find this latter interpretation, which does not entail a shift in the burden of proof, more persuasive, because the record does indeed contain substantial evidence in support of the fitness and good character of the applicants, and contains no evidence to the contrary. *See Citizens Association of Georgetown v. District of Columbia Alcoholic Beverage Control Board,* D.C.App., 410 A.2d 195, 197 (1979) (applicant supplied a prima facie case of statutory compliance and met its burden of proceeding).

■ The Board found that Ben Aniba had been employed as an insurance salesman for over ten years, that he had been a lessor or guarantor of the lease of the premises for over ten years, and that he and his wife were permanent residents of the United States. These findings, which are undisputed, show a pattern of good citizenship and professional stability. Moreover, Irving Hall testified that he had never observed any illegal conduct on the premises. Even one of the opposition witnesses, Ms. Pauley, testified that Ben Aniba was undoubtedly "a fine person" and "a lovely family man." The Board thus accurately characterized the evidence when it stated that there was "no evidence" suggesting a lack of good character on the part of the applicant. Petitioners' attempt to introduce testimony relating to the Birdcage Shop does not constitute evidence contrary to the Board's findings, for the Board properly ruled that such testimony was irrele-

vant, *see* Part II(B) *supra.* Accordingly, we conclude that the Board did not shift the burden of proof on the issue of fitness and character, and we affirm the Board's findings on this issue.

### B. *Appropriateness of the Premises*

The second group of findings in which the Board's language is less than exemplary relates to the issues of trash disposal, noise, parking, and traffic congestion.[13] Here the Board framed its findings in the following language:

32. There is *insufficient evidence to support Protestants' contention* that the granting of this application will exacerbate existing trash problems in the area. The Applicant has made adequate provisions for the collection of trash.

33. There is *insufficient evidence* that the granting of this application will have an adverse impact on existing noise problems.

34. There is *insufficient evidence* that the issuance of this license will have an adverse impact on existing parking and traffic congestion problems in the area. The Board notes that several off street parking lots are located within two (2) blocks of applicant's premises. [Emphasis added.]

■ As above, the Board's phraseology lends credence to petitioners' assertion that the Board entertained a presumption in favor of the applicants on these issues. But the Board made other findings on these issues as well—findings that are phrased in the affirmative. For example, the Board stated:

25. Applicant's trash is removed by the Inter City Trash Company, five days a week under contract. Applicant indicates that it has not received any complaints regarding trash or litter.

26. There is on-street metered parking in front of Applicant's premises on

---

13. *Though* considerations such as trash, noise, parking, and traffic are not statutory criteria, the Board often relies upon such factors as subsidiary issues relevant to the appropriate-

ness of the premises. *See D. T. Corp. v. District of Columbia Alcoholic Beverage Control Bd.,* D.C.App., 407 A.2d 707, 712–13 (1979) (Newman, C. J., concurring).

both sides of "M" Street in the 3200 block. There are several off street parking lots located within two (2) blocks of Applicant's premises. A large parking lot (Doggetts) is located immediately across "M" Street to the South.

The Supervisor of this parking lot, Mr. Irving Hall, testified that demand for parking on this lot has not noticeably increased since Applicant's establishment opened in June, 1979. Mr. Hall further testified that there had been a noticeable decline in parking patronage on this lot in the summer of 1979 compared to 1978 and 1979.

Moreover, the Board noted that it had received a petition containing 190 signatures in support of the application, (Finding 27), a fact that is relevant to the statutory requirement that the wishes of neighboring residents and property owners be taken into account, *see* D.C.Code 1973, § 25–115(a)(6).[14]

When the Board's findings are interpreted as a whole, we cannot say that the Board shifted the burden of proof to the petitioners. As this court has recently stated,

[The applicant] is not required to prove there is no parking problem in Georgetown in order to qualify for a license. That would be an impossible burden. The Board is permitted to consider the effect a prospective licensee will have on parking problems and traffic patterns . . . . However every location is unique, and the Board must evaluate each application according to the particular circumstances involved. [*Le Jimmy, Inc. v. District of Columbia Alcoholic Beverage Control Board*, D.C.App., 433 A.2d 1090, 1093 (1981).

Though there was conflicting evidence on these issues, in contrast to the fitness and character issue, we conclude that the Board's affirmatively-phrased findings are supported by substantial evidence. "If there is substantial evidence to support the Board's finding[s], then the mere existence of substantial evidence contrary to [those] finding[s] does not allow this court to substitute its judgment for that of the Board." *Spevak v. District of Columbia Alcoholic Beverage Control Board*, D.C.App., 407 A.2d 549, 554 (1979). Thus any weaknesses in the Board's negatively-phrased findings are without prejudicial effect on the petitioners. *See* D.C.Code 1978 Supp., § 1–1510; *Sherman v. Commission on Licensure to Practice the Healing Art*, D.C.App., 40 A.2d 595, 602 (1979); *Braniff Airways, Inc. v. Civil Aeronautics Board*, 126 U.S.App.D.C. 399, 411–12, 379 F.2d 453, 465–66 (1967). We accordingly affirm the Board's conclusion that the premises are appropriate for the issuance of a Class "D" license.

### IV. *Class "F" Licenses*

Finally, we address briefly petitioners' contention that the issuance of Class "F" licenses was unlawful and "prejudged" the Class "D" proceedings.

■ First, the suggestion that the Board's ruling on the Class "F" licenses "prejudged" the issues in the Class "D" proceeding is meritless, as the Board had already received all the evidence on the Class "D" application at the time it issued its order in the Class "F" proceedings. The Board's subsequent decision on the Class "D" license, issued three months later, made no mention of the Class "F" proceedings. Moreover, Class "D" and Class "F" applications each raise completely different issues. A Class "F" license may be issued "solely in the discretion of the Board." D.C.Code 1973, § 25–111(j). Class "D" license applicants, by contrast, must meet certain statutory criteria, *see id.* § 25–115.

■ With respect to the lawfulness of the class "F" licenses themselves, we have

---

14. Petitioners also argue that the Board erred in refusing to deny the applicant's license, on the ground that the Georgetown area is already saturated with liquor licenses. The Board stated, "Protestants' contention that no further licenses be issued in this area is more appropriately addressed to the District of Columbia City Council." (Finding 30.) This court has consistently agreed with the Board's position on this point. *See Le Jimmy, Inc. v. District of Columbia Alcoholic Beverage Control Board*, D.C.App., 433 A.2d 1090, 1093 (1981); *Palace Restaurant, Inc. v. Alcoholic Beverage Control Board*, D.C.App., 271 A.2d 561, 562 (1970).

no jurisdiction to consider this aspect of petitioners' argument. The Board's order denying petitioners' motion to suspend or revoke the Class "F" licenses was issued November 26, 1979. This ruling was a final, appealable order within the meaning of D.C.Code 1978 Supp., § 1–1502(11). *See Washington Urban League, Inc. v. Public Service Commission,* D.C.App., 295 A.2d 906, 908 (1972). Petitioners did not timely seek review of this order. Accordingly, we are without jurisdiction to review it. D.C. App.R. 15(b).

## V. *Conclusion*

In sum, we hold that the Board did not abuse its discretion in excluding petitioners' evidence relating to an adjoining retail shop that was no longer in existence, on the grounds that such evidence was irrelevant to the appropriateness of the premises for a license and irrelevant to the applicant's character and fitness. We also conclude that the Board did not improperly shift the burden of proof to the petitioners and that the Board's findings are supported by substantial evidence. We thus affirm the Board's order.

*Affirmed.*