WASHINGTON PRESS CLUB,
Petitioner,

v.

DISTRICT OF COLUMBIA ALCOHOL-
IC BEVERAGE CONTROL
BOARD, Respondent.

Apolline Unit Owners' Association,
Intervenor.

No. 83–502.

District of Columbia Court of Appeals.

Argued April 24, 1984.

Decided May 31, 1984.

James A. Kidney, Washington, D.C., for petitioner.

Karen J. Krueger, Assistant Corporation Counsel, Washington, D.C., with whom Inez Smith Reid, Corporation Counsel, John H. Suda, Principal Deputy Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, Washington, D.C., were on the brief, for respondent.

Michael B. McGovern, Washington, D.C., for intervenor.

Before FERREN and TERRY, Associate Judges, and REILLY, Chief Judge, Retired.

FERREN, Associate Judge:

Petitioner, the Washington Press Club (WPC), challenges a decision of the District of Columbia Alcoholic Beverage Control Board (the Board) denying WPC's application for a Class C liquor license to sell beer, wine, and spirits to members and guests on WPC premises. WPC applied for the license as a "bona fide ... club" under D.C. Code § 25–111(a)(7) (1981 & Supp.1983). In denying the application, the Board concluded that the premises for which the license was sought did not meet the requirements set forth in the Alcoholic Beverage Control Act's definition of a "club." D.C.Code § 25–103(7) (1981). Petitioner contends that the Board has misinterpreted § 25–103(7) and thereby imposed unreasonable restrictions on the issuance of licenses. We disagree and thus affirm the decision of the Board.[1]

I.

WPC is a nonprofit corporation which traces its origin back sixty-five years. Its membership—restricted to persons en-

---

**1.** In addition to concluding that the WPC premises failed to meet the statutory requirements for a "club," the Board decided that the premises were not "appropriate ... considering the character of the premises, its surroundings, and the wishes of the persons residing or owning property in the neighborhood." D.C.Code § 25–115(a)(6) (1981 & Supp.1983). In light of our decision to affirm the Board's conclusion that the premises do not constitute a "club"—an independent and sufficient ground for denying WPC's application—we need not address this second basis for the Board's decision.

gaged in full-time careers in journalism— numbers 665, of whom 350 are active resident members. WPC's stated purposes are to "encourage higher professional standards in journalism" and to "present outstanding leaders and foster discussion in meetings and seminars, thereby encouraging dissemination of information to the public." In furtherance of these purposes, WPC for many years has held weekly luncheons at which its members could meet with leaders from government, business, science, or other areas of public importance. Before 1982, these lunches were held in public restaurants.

In February 1982, WPC purchased three units on the first floor of a primarily residential condominium at 1330 New Hampshire Avenue, N.W. WPC removed the dividing wall between two of the units and converted this area to a meeting room. This space of approximately 1,100 square feet, contains eleven tables that seat four persons each, a bar, and a "regular condominium apartment kitchen." WPC now holds some of its weekly luncheons in this meeting room. It also holds evening social functions there and permits members to reserve the premises for private parties. When food is provided at any of these events, it is catered or otherwise delivered to the premises; no food is cooked or prepared in the kitchen of the meeting room.

In October 1982, WPC applied for a Class C retail liquor license for the meeting room. Such a license would permit WPC to sell alcoholic beverages to its members and guests at both afternoon and evening WPC functions. After a hearing in November 1982, the Board denied WPC's application on the ground that the WPC meeting room did not qualify as a club. *See* note 1 *supra.*

## II.

The Alcoholic Beverage Control Act prescribes two types of standards that must be met before an applicant can be treated as a "club" eligible to apply for a Class C liquor license. The first type requires the applicant to have certain organizational characteristics. The applicant must be "a corporation for the promotion of some common objective (not including corporations organized for any commercial or business purpose, the object of which is money profit)." D.C.Code § 25–103(7) (1981).[2] Moreover, the applicant's "affairs and management" must be "conducted by a board of directors, executive committee, or similar body chosen by the members," and "no officer, agent, or employee of the club" may receive "any profit from the disposition or sale of·beverages to the club or to members of the club or guests ... beyond the amount of such salary as may be fixed"

**2.** D.C.Code § 25–103(7) (1981) provides in full:

(7) The word "club" means a corporation for the promotion of some common object (not including corporations organized for any commercial or business purpose, the object of which is money profit), owning, hiring, or leasing a building or space in a building of such extent and character as in the judgment of the Board may be suitable and adequate for the reasonable and comfortable use and accommodations of its members and their guests, and including such space outside of the building and adjoining it as may be approved by the Board, and provided with such suitable and adequate kitchen and dining room space and equipment, implements, and facilities, and employing such a sufficient number of employees for cooking, preparing,

and serving meals for its members and their guests, as shall satisfy the Board that the sale of beverages intended is not more than an incident to and is not the prime source of revenue from such space; and the affairs and management of such corporation are conducted by a board of directors, executive committee, or similar body chosen by the members at least once each calendar year and no officer, agent, or employee of the club is paid directly or indirectly, or receives in the form of salary or other compensation, any profit from the disposition or sale of beverages to the club or to the members of the club or guests introduced by members beyond the amount of such salary as may be fixed and voted by the members, or by its directors, or other governing body.

by the organization. *Id.* The club must also have been "established for at least 3 months immediately prior to the making of the application." D.C.Code § 25–111(a)(7) (1981).

The second standard a "club" applicant must meet embraces criteria for evaluating the premises for which a license is sought, including the manner in which the premises are to be put to use. The applicant must own, hire, or lease "a building or space in a building ... suitable and adequate for the reasonable and comfortable use of its members and their guests." D.C.Code § 25–103(7) (1981). Additionally, and most pertinent to this decision, a "club" must possess "such suitable and adequate kitchen and dining room space and equipment, implements, and facilities, and employ[ ] such a sufficient number of employees for cooking, preparing, and serving meals for its members and their guests, as shall satisfy the board that the sale of beverages intended is not more than an incident to and is not the prime source of income from such space." *Id.*

There is no question that WPC possesses the organizational characteristics necessary to be considered a "club." The Board made specific findings in favor of WPC as to each of the organizational criteria. Thus, in denying WPC's application, the Board relied on its evaluation of the premises and the applicant's proposed use of the premises, not on a belief that WPC—as an organization—is unsuited to be a licensee.[3]

The Board's conclusion that WPC's meeting room did not qualify as a club was based on its findings that:

Applicant does not intend to cook and prepare food on the premises for its functions. The food for its weekly luncheons will be catered from outside.

No utensils, food and dinnerware were on the premises during an inspection conducted by [the] Alcoholic Beverage Control Investigator.

In effect, the Board concluded that an applicant who is not equipped and does not plan to prepare any food on the premises for which a license is sought cannot "satisfy the Board that the sale of beverages intended is not more than incidental to and is not the prime source of revenue from such space." D.C.Code § 25–103(7) (1981).

WPC does not dispute that the Board's findings are supported by substantial evidence in the record, but argues instead that the Board's conclusion represents an erroneous reading of § 25–103(7). WPC contends that its stated intention to have catered food provided at most of the functions conducted in its meeting room is an adequate assurance that the sale of alcoholic beverages will be only an incidental use of that space.

It is well-established that " 'an agency's interpretation of the statutes and regulations it administers will be sustained unless shown to be unreasonable or in contravention of the language or legislative history of the statute.' " *Haight v. District of Columbia Alcoholic Beverage Control Board,* 439 A.2d 487, 491 (D.C.1981) (quoting *DeLevay v. District of Columbia Rental Accommodations Commission,* 411 A.2d 354, 359 (D.C.1980)). For this reason, "we must accord considerable respect ... [to] the Board's interpretation of the underlying statutory requirements for obtaining a liquor license." *Id.* We hold that the Board's interpretation of § 25–103(7) is rea-

---

**3.** Appellant, in its brief to this court, argues that the Board failed to appreciate WPC's status as a "distinguished," "professional" organization, and that the decision to deny the application was premised on an erroneous assumption that the sale of alcohol would become WPC's prime source of revenue and its principal purpose. Because we read the Board's decision to rest on concerns limited to the manner in which WPC equipped and planned to use the premises in question, and not on judgments regarding WPC's organizational characteristics, we need not address this argument.

sonable and consistent with the language and purposes of the statute.

The factors that the Board is to consider in attempting to determine whether the sale of alcoholic beverages will be no more than an incidental use of the premises are expressly enumerated by the statute. The Board must determine whether the "building or space in a building" for which a license is sought is "provided with ... suitable and adequate kitchen and dining room space and equipment, implements, and facilities." D.C.Code § 25–103(7) (1981). It must also consider whether the applicant employs "a sufficient number of employees for cooking, preparing, and serving meals for its members and their guests." *Id.*

WPC engages in unpersuasive mental gymnastics in an effort to avoid the plain wording of these statutory criteria. It first points out, correctly, that § 25–103(7) does not require an applicant to have or maintain any specific level of the statutory factors (kitchen and dining space, equipment, implements, facilities, and employees), but instead requires only that the level of these factors be sufficient to "satisfy" the Board. From this observation, WPC argues that it is within the Board's discretion to be satisfied that the sale of liquor will be only an incidental use of the premises, even when the applicant does not have—or will not make use of—any equipment, implements, facilities, or employees to cook, prepare, and serve meals. Finally, WPC contends that an applicant's promise to have catered meals delivered to most of the functions at which liquor is to be sold should be sufficient to "satisfy" the Board and bring the applicant within the statutory definition of a "club."

The fact that the statute confers considerable discretion on the Board to determine the minimum level of the enumerated statutory factors necessary to satisfy it regarding the principal use of the premises does not, however, mean that the Board can ignore these factors in favor of other criteria aimed at accomplishing the same ends. Section 25–103(7) does not offer the enumerated factors as examples of the type of criteria the Board is to apply, nor does it in any way suggest that the Board may look to alternative factors. The statute clearly contemplates that the Board's evaluation of the premises and their intended use is to focus on the factors set forth in the definition of "club." Thus, the plain language of the statute supports the Board's refusal to accept WPC's assurances regarding its plans to provide catered food in lieu of meeting the statutory criteria of equipping the premises and making the necessary arrangements for its own employees to prepare food on the premises.

This interpretation of § 25–103(7) also comports with a reasonable reading of the purpose of the statute. Congress took particular care in crafting the § 25–103(7) definitions of organizations eligible for a Class C license, in order to "preclude issuance of licenses to hotels, restaurants and clubs which are not bona fide establishments." H.Rep. No. 274, 73d Cong., 2d Sess. 3 (1934). The Board's reading of the definition of "club" provides an easily administrable standard that furthers this statutory purpose. An applicant who has purchased the equipment and hired the employees necessary to prepare and serve food on the premises for which a license is sought has manifested a commitment to using the premises primarily for a purpose other than the sale of alcoholic beverages. This commitment can be evaluated at the outset, as well as monitored during the license period, in a manner that is not possible for an applicant or licensee that merely gives an assurance that the sale of liquor will be incidental to the service of catered meals. Accordingly, we decline to upset the Board's interpretation of § 25–103(7).

·   *Affirmed.*