DUPONT CIRCLE CITIZENS
ASSOCIATION, et al.,
Petitioners,

v.

DISTRICT OF COLUMBIA ALCO-
HOLIC BEVERAGE CONTROL
BOARD, Respondent,

H.H. Leonards Associates, Intervenor.

No. 98–AA–1452.

District of Columbia Court of Appeals.

Argued Oct. 12, 2000.
Decided Jan. 25, 2001.

Richard B. Nettler, with whom G. Brent Connor was on the brief, Washington, DC, for petitioners.

Stephen J. O'Brien, with whom Leonard J. Henzke, Jr. was on the brief, Washington, DC, for intervenor.

Robert R. Rigsby, Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, filed a statement in lieu of brief for respondent.

Before WAGNER, Chief Judge, and FARRELL and RUIZ, Associate Judges.

FARRELL, Associate Judge:

This petition for review challenges the decision of the District of Columbia Alcoholic Beverage Control Board (the Board) awarding a Retailer's License Class C/X (Club) to intervenor, H.H. Leonards Associates (HHLA). Petitioners [1] attack the Board's decision on a variety of substantive and procedural grounds, but primarily argue that the Board misunderstood its statutory obligation by failing to examine whether HHLA currently operates as a for-profit corporation, an inquiry petitioners believe mandated by D.C.Code § 25–

---

1. Petitioners are the Dupont Circle Citizens Association, the Georgetown Residents Alliance, the Federation of Citizens Associations, the Kalorama Citizens Association, the Logan Circle Citizens Association, and an individual named Jerrold Kluger.

103(7) (1996) (defining "club" to exclude for-profit organizations); and that the Board similarly erred in finding that HHLA met additional licensure requirements of the Club Exception Act, D.C.Code § 25–116(a). We affirm.

## I.

HHLA first applied to the Board in 1993 for a Class C/X retailer's license for a "club" at The Mansions, a townhouse located at 2020 O Street, N.W., in a neighborhood zoned for residential use. The Board granted the license, but that decision was reversed by this court on the ground that HHLA had not been incorporated for three months before filing its application, as required by statute. *See Chase v. District of Columbia Alcoholic Beverage Control Bd.*, 669 A.2d 1264 (D.C.1995). While that appeal was pending, the Council of the District of Columbia enacted D.C. Law 10–122, which amended D.C.Code § 25–116(a) so as to preclude issuance of new ABC licenses in areas zoned for residential use. However, in December 1996 the Council enacted D.C. Law 11–258 (effective April 15, 1997), known by shorthand as the Club Exception Act, which provided a six-month "window" for pre-existing private clubs located within residentially-zoned districts to apply for licensure, despite any moratorium on issuance of new licenses.[2] See D.C.Code § 25–116(a) (March 2000 Supp.).

As authorized by D.C. Law 11–258, HHLA filed a new application for a Class C/X Club license in July 1997. After protests were filed, the Board held hearings and, in July 1998, issued findings of fact, conclusions of law, and an order granting HHLA's application with conditions. This petition for review followed.

## II.

■ D.C.Code § 25–116(a), as amended in 1997, provides in relevant part:

Notwithstanding any moratorium on license issuance declared by the Alcohol Beverage Control Board, a club that meets the requirements of § 25–103(7) with a valid business license as of January 1, 1996, is located in a residential district, has been established at its existing location for at least 3 years prior to January 1, 1996, and has no outstanding debt to the federal or District of Columbia governments, shall be permitted to apply for a retailers license Class C/X for a period of time not to exceed 6 months after April 12, 1997. The Board, after determining that the requirements of § 25–115 have been met, may issue a retailer's license Class C/X to a club in a residential district notwithstanding any moratorium on license issuance.

Petitioners first contend that in deciding whether HHLA "[met] the requirements of § 25–103(7)," the Board failed to inquire whether it was currently operating as a nonprofit corporation. Section 25–107(7) defines a "club" in part to mean "a corporation for the promotion of some common object (not including corporations organized for any commercial or business purpose, the object of which is money profit)." Petitioners argue that under this definition it is not enough for the corporation to be "organized"—in the sense of established or registered, for taxation or other purposes—as a nonprofit organization, but in addition it must be conducted as one, so that the Board was required "to assess HHLA's current, day-to-day operations to determine if it continued to operate as a true nonprofit" (Br. for Pet. at 24). The Board disagreed, and we do also.

There is no dispute that HHLA was and remains "organized" as a nonprofit corporation. An *Internal Revenue Service* document in the record setting forth HHLA's tax-exempt status confirms that fact. As we explained in *Chase,* 669 A.2d at 1265,

---

**2.** D.C. Law 11–258 (at Section 3) expressly named HHLA as an intended beneficiary of the legislation.

"HHLA was organized in August, 1990 as an unincorporated non-profit membership association," which later "voted to incorporate as a non-profit corporation." In *Washington Press Club v. District of Columbia Alcoholic Beverage Control Bd.*, 476 A.2d 1107 (D.C.1984), we recognized that § 25–103(7)'s requirement of nonprofit status is an "organizational" standard, *id.* at 1108; it focuses on how the corporation is organized and for what purpose, and as such sets forth "an easily administrable standard." *Id.* at 1110. By contrast, when the Council meant the Board to look beyond organizational purpose to actual conduct, it made that intention clear. D.C.Code § 25–111(a)(12) permits a corporation to obtain a so-called "consumption license for a club" provided (*inter alia* ) it is not a "corporation[ ] organized *or conducted* ... for money profit" (emphasis added).

In denying petitioner's request that it assess HHLA's conformity in practice to its nonprofit status, the Board relied correctly on our decision in *Kopff v. District of Columbia Alcoholic Beverage Control Bd.*, 413 A.2d 152 (D.C.1980). There, despite the fact that the intervenor had been issued a certificate of occupancy by another government agency, the petitioners asked the Board to hear evidence that the certificate should not have been issued because of alleged fire safety conditions. We sustained the Board's exclusion of that evidence, stating:

> If the Board had gone behind the certificate of occupancy to ascertain whether or not it was properly issued, the Board would have been acting in effect as a court of appeals over other coordinate administrative departments. The Board has neither the jurisdiction nor the expertise to review compliance with safety requirements in such a manner. The correct avenue for pursuing any alleged violation of the Safety or Building Codes

is a complaint to the appropriate government entity involved.

*Id.* at 154. So too, the Board reasonably concluded that it lacked "the jurisdiction or expertise" to review HHLA's compliance with its nonprofit status. If petitioners thought HHLA was abusing that status, its proper recourse lay with the governmental entities that administer nonprofit corporations and tax exemption laws.

*Kopff* and this case thus differ from *Craig v. Alcoholic Beverage Control Bd.*, 721 A.2d 584 (D.C.1998), relied on by petitioners, in which the intervenor argued that the Board of Zoning Adjustment's issuance of a certificate of occupancy for it to operate a *restaurant* in a residential district barred separate consideration by the Board of whether to issue a *liquor* license for the same establishment. Unsurprisingly, we rejected that argument because the Board was being asked only "to determine whether the license applicant meets the requirements of the statute the Board is responsible for administering." *Id.* at 588. Here, by contrast, the Board reasonably concluded that assessment of whether HHLA currently operated as a nonprofit organization was not required by the statute it administers. *See Chase*, 669 A.2d at 1267 (holding that a court "must defer to the agency's interpretation of the statute [it administers] if it is not plainly wrong or inconsistent with the legislative purpose").[3]

### III.

■ Petitioners next contend that the Board erred in finding that HHLA had "a valid business license as of January 1, 1996," and had been "established at its existing location for at least 3 years prior to" that date, both required by § 25–116(a).

The Board found that HHLA possessed a valid cigarette retail license issued by

---

**3.** The Board, accordingly, did not err in refusing to hear testimony from Matthew Watson, petitioner's proposed expert on whether

HHLA currently operated as a nonprofit organization.

the Department of Consumer and Regulatory Affairs in August 1995. Petitioners disparage that license as insufficient; what HHLA needed, they say, since there is no such thing as a "club business license" in the District of Columbia, was either a certificate of occupancy for a club or a restaurant license, neither of which it had as of January 1, 1996.[4] Again, however, petitioners' argument founders on the language of the statute—at least as construed reasonably by the Board. The statute requires the applicant to have had "a valid business license," not (more particularly) a restaurant license or a certificate of occupancy. The requirement of a valid business license is but one criterion by which the Council limited the class of those eligible for a retailers club license in residential districts despite the existence of the moratorium. HHLA's cigarette license satisfied both the language of the statute and its evident purpose to limit the class of applicants to established clubs already regulated by some form of licensure.

■ Petitioners also assert that HHLA had not been established at the *entire* location for which it sought the license for at least three years before January 1, 1996. Their argument is that, although HHLA had concededly existed at 2020 O Street for much longer than the three-year period, *see Chase*, 669 A.2d at 1265–66, it did not possess a valid occupancy permit covering both 2020 and 2018 O Street, part of which it also occupied, until 1998. Once more, however, this confuses the requirement of an occupancy permit with the statutory standard, which requires only that the club have been "established" for the necessary period. There was undisputed testimony that the first floor and basement of 2018 O Street had been incorporated into 2020 O Street since at least

1992. The Board found this to be sufficient evidence that HHLA had been established-combining parts of "two adjoining contiguous townhouses"—at its location for the statutory period. We have no reason to disturb that finding.

**IV.**

■ The Board must deny a license application if "[t]he establishment for which the license is sought is in violation of 1 or more of the Construction Codes for the District of Columbia, or any other law or rule of the District intended to protect public safety." D.C.Code § 25–115(d)(1). Petitioners contend that HHLA was in violation of public safety laws because "[t]here was no certificate of occupancy for 2018 O Street until January 30, 1998, long after HHLA had been using the premises at that address for a club, and there was [also] no certificate of occupancy permitting the retail sales that occur on HHLA's premises" (Br. for Pet. at 32). The statute, however, speaks to compliance with the law at the time of the Board's decision ("*is* in violation of . . . any . . . law"; emphasis added). The Board found that despite the initial restriction of HHLA's occupancy permit to 2020 O Street, "[s]ubsequent certificates of occupancy to indicate a new number for the combined lots [2020 and 2018] and to add the basement area were granted on January 30, 1998 and March 11, 1998." In the Board's view, these "certificate[s] of occupancy duly—issued by the Zoning Division, DCRA, for an area comprised of two combined lots which have been recorded in the Office of the Surveyor," brought HHLA in compliance with § 25–115(d)(1)'s requirement. That interpretation of the statute is reasonable, and must be sustained. *Chase, supra.*[5]

---

4. The Board did not decide whether the restaurant license HHLA possessed as of January 1, 1996, although issued to an affiliate entity, met the statutory requirement.

5. There was testimony that pieces of artwork and furniture on the premises were occasionally bought by guests of the bed and breakfast

establishment located above HHLA. The Board did not expressly address petitioners' claim that HHLA lacked a permit for those retail sales, but we find no error in that omission given the sketchy testimony as to how often or where in the building the sales occurred, and under whose auspices (the wit-

■ Petitioners also point to testimony that alcoholic beverages were consumed at the club during periods when HHLA was not licensed by the Board, and so argue that the Board inadequately considered "the licensee's record of compliance with the provisions of this chapter," as required by D.C.Code § 25–115(b)(1)(G). Past compliance with the ABC laws is one of several "appropriate[ness]" qualifications an applicant must demonstrate "to the satisfaction of the Board." D.C.Code § 25–115(b)(1); *North Lincoln Park Neighborhood Assoc. v. Alcoholic Beverage Control Bd.,* 666 A.2d 63, 67 (D.C.1995). But once the Board is satisfied that the requirement has been met, our review of that decision is deferential. *See generally, Gerber v. District of Columbia Alcoholic Beverage Control Bd.,* 499 A.2d 1193, 1196 (D.C.1985). The Board found that, after this court reversed the initial grant of a license to HHLA:

> [HHLA] continued in existence, and has permitted the consumption of alcoholic beverages on its premises from time to time. On some occasions, [HHLA] was granted one-day licenses by the Board. On other occasions, [HHLA's] members have been permitted to bring beer and wine purchased independently upon the premises. Applicant has never been cited for a violation of the ABC laws or regulations while it held an ABC license.

Since the Board adequately considered HHLA's record of compliance with the ABC laws, we again find no reason to disturb its decision.[6]

## V.

Challenging the procedural fairness of the protest hearing, petitioners claim error in the Board's disqualification of Board Member Dennis Bass from participating in the hearing, and they dispute the Board's decision to allow Board Member Eva Candon to participate.

### A.

■ At a status conference, HHLA asked Member Bass to recuse himself from hearing the application, and he declined. HHLA then filed a written motion with the Board asking that Mr. Bass be recused on the ground that, before becoming a Board member and while Chairman of Advisory Neighborhood Commission 2B, he had (1) signed a letter published in the Washington Post criticizing the former Chair of the Board for granting the earlier license to HHLA; (2) requested a member of the Council of the District of Columbia to introduce legislation barring issuance of a license to HHLA, and (3) testified before the Board in opposition to HHLA's previous license application. After receiving petitioners' opposition, the Board granted the motion and disqualified Member Bass from hearing the case.

Petitioners argue that it was improper for the full Board to decide whether Bass should be recused, citing case authority

ness in question denied that HHLA sold any of the items).

6. We reject without further discussion petitioners' other challenges to the Board's appropriateness determination. Also, the Board recognized its need to give proper weight to the views of the Advisory Neighborhood Commission, *see* D.C.Code § 1–261(d) (1999); *Upper Georgia Ave. Planning Comm. v. Alcoholic Beverage Control Bd.,* 500 A.2d 987, 993 (D.C. 1985), and we are satisfied that it did so. Assuming, without deciding, that the Board should have enforced the subpoena for the testimony of H.H. Leonards, HHLA's president, petitioners were not prejudiced by its refusal to do so, in light of (1) our conclusion that evidence of whether HHLA was being operated as a nonprofit organization (which is at least partly why they wanted to question Ms. Leonards) was irrelevant, (2) the testimony petitioners *were* able to elicit from Paul Ingenito, the "day to day" operator of the Mansion, and (3) the opportunity the Board afforded petitioners-but of which they did not avail themselves-to revisit the need for testimony by Ms. Leonards at the end of Ingenito's testimony. Nor have petitioners cited any statute or regulation entitling them to discovery of HHLA's business records which they also sought by subpoena.

that such determinations are personal to a judge or similar decisionmaker, who "knows fully his own thoughts and feelings and the complete context of facts alleged." *United States v. Mitchell,* 377 F.Supp. 1312, 1315 (D.D.C.1974), *aff'd,* 181 U.S.App. D.C. 254, 559 F.2d 31 (1976). But whether an agency tribunal such as the Board commits the disqualification decision entirely to the individual member, or asserts the authority to itself disqualify a member, seems to us a matter over which the court has almost no review authority. Petitioners cite no statute or rule that compels the Board to follow one practice rather than the other. If we were to agree with petitioners nonetheless that a party's only recourse for a Board member's erroneous refusal to recuse is *judicial* review, we would interfere unnecessarily with an important aspect of agency self-governance.

▆▆▆▆ As to the merits of the Board's decision, we have recognized that the criteria governing recusal of judicial officers apply also to agency decisionmakers acting in an adjudicative or quasi-judicial capacity. *See Morrison v. Board of Zoning Adjustment,* 422 A.2d 347, 349–50 (D.C.1980). In seeking recusal on the ground of bias, a party initially must allege facts that (1) are "material and stated with particularity"; (2) are "such that, if true[,] they would convince a reasonable [person] that a bias exists"; and (3) "show [that] the bias is personal as opposed to judicial, in nature." *Carter v. Carter,* 615 A.2d 197, 199 (D.C. 1992) (citations omitted). Petitioners contend here only that the facts allegedly creating the appearance of bias do not reveal any personal bias on the part of Mr. Bass, because his prior actions were performed "in his capacity as chair of the ANC's ABC Committee and ... *not* ... in

his capacity as a private citizen" (Br. for Pet. at 38).

As the Supreme Court explained in *United States v. Grinnell Corp.,* 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966), however, personal bias in this context means that "[t]he alleged bias must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *Id.* at 583, 86 S.Ct. 1698. As this court has stated, the bias must "have its source 'beyond the four corners of the courtroom.'" *Gregory v. United States,* 393 A.2d 132, 142 (D.C. 1978) (citation omitted). Pertinent to the issue before us is Canon 3E of the Code of Judicial Conduct for this jurisdiction, which provides:

> (1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:
>
> \* \* \* \* \* \*
>
> (b) the judge served as a lawyer in the matter in controversy, ... *or the judge has been a material witness concerning it.* (Emphasis added.)

Mr. Bass's alleged bias stemmed from a source other than prior service as a Board member. He had testified before the Board in opposition to HHLA's earlier application for an alcoholic beverage license, and whether he had done so in his capacity as ANC chair or private citizen is beside the point.[7] His public pronouncements (not factually disputed by petitioners) on essentially the same factual issue he would be judging as Board member—whether HHLA should be licensed by the Board— gave rise to a reasonable question as to his impartiality.[8] The Board did not abuse its authority in disqualifying him once he declined the request to recuse himself.[9]

---

7. As HHLA points out, nothing in the record implies that Mr. Bass did not himself share the views he allegedly espoused as an ANC commissioner.

8. Indeed, when this case had been before the Board the first time, Bass voluntarily recused himself from the decision.

9. For this reason, we need not consider HHLA's argument that any error in the exclu-

### B.

 Petitioners argue that Member Candon should have been disqualified because her term on the Board had expired and she was no longer lawfully entitled to sit. Relying on D.C.Code § 25–104(a), which allows a member whose term has expired to continue serving on the Board "until replaced or renominated," they point out that Ms. Candon had been replaced as Chair of the Board in 1996. But, as HHLA rejoins, Ms. Candon had been replaced only as Chair of the Board, not member—

a position she still held at the time of the hearing. Since petitioners do not dispute that fact, the Board had no reason to disqualify Ms. Candon.

*Affirmed.*

---

sion was harmless in light of the unanimous decision of the sitting members to grant the license.